# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**MICHAEL F. MARASCHIELLO**      )
**#274760,**                    )
                            )
     **Petitioner,**        )
                            )   **No. 3:21-cv-00302**
**v.**                         )   **Judge Trauger**
                            )
**TONY MAYS, Warden,**     )
                            )
     **Respondent.**      )

## MEMORANDUM

In 1997, a jury in Montgomery County, Tennessee, convicted Michael Maraschiello of several crimes including the first-degree murder of his estranged wife. After an unsuccessful direct appeal and prolonged, unsuccessful post-conviction proceedings, Maraschiello filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus in this court. Maraschiello, the petitioner in this case, requests an evidentiary hearing and the appointment of counsel. The respondent filed an answer (Doc. No. 19) and the petitioner filed a reply. (Doc. No. 21.) For the following reasons, the petitioner is not entitled to relief under Section 2254, his requests for an evidentiary hearing and the appointment of counsel will be denied, and this case will be dismissed.

## I. Background

On post-conviction appeal, the Tennessee Court of Criminal Appeals (TCCA) summarized the evidence presented at trial as follows:

> Petitioner's convictions arose from his planned killing of his estranged wife, Roxie Maraschiello, on February 16, 1995, at her home in Clarksville, Tennessee. Petitioner has never denied his role in the killing of the victim. Petitioner served as a captain in the United States Army, ultimately commanding a company during the Persian Gulf War. Petitioner felt that the victim had a difficult time adjusting to life as a military officer's wife. Petitioner claimed that his relationship with the victim suffered because the victim had psychological problems that stemmed from her

being raped by her previous husband.[1] Petitioner stated that he married "someone who needed more care and help than I did or had some major problems." Petitioner felt the victim was engaged in behavior that "wasn't acceptable in terms of a normal relationship."

Following the Persian Gulf War, Petitioner was assigned to Fort Campbell, where he began to receive poor performance reviews. Petitioner recounted that the victim increasingly neglected her family obligations to pursue a social life elsewhere. In early 1993, the victim filed a complaint with the Fort Campbell Family Advocacy Program. She alleged that Petitioner abused her both mentally and physically. The victim, with Petitioner's assistance, later drafted affidavits that recanted the abuse claims.

Following his honorable discharge from the Army in 1993, Petitioner continued to serve in the United States Army Reserve. Petitioner obtained employment with the Nashville Metropolitan Police Department. Petitioner underwent a psychological examination in connection with his police department employment. While nothing significant stood out, the psychologists noted "a defensive gruffness that bordered on anger" and "some adjustment problems and behavior traits which cause[d] [Petitioner] difficulties in relating to others." While at the police academy, Petitioner was subjected to several disciplinary actions. After his graduation from the police academy, Petitioner's training officers noted that Petitioner resisted orders and that Petitioner found it difficult to draft objective incident reports. Petitioner was described as argumentative and had definitive opinions about how things should be done. Petitioner would not accept any criticism or supervision, and his employment with the police department was terminated in 1994.

The victim initiated divorce proceedings in October 1994. Petitioner filed a petition for an order of protection that alleged the victim threatened to kill him and the victim owned a pistol. In November 1994, Petitioner's eldest daughter reported that Petitioner sexually abused her. Due to insufficient evidence the sexual abuse investigation was discontinued. Following the divorce filing and abuse allegations, the victim moved to Clarksville with the children. The victim refused to tell Petitioner her address. In December 1994, the court issued a restraining order that restrained both parties from harassing each other or making threats of violence. Because there was insufficient evidence to support the sexual abuse claims, the court granted Petitioner unsupervised visitation. At trial, Petitioner denied that he abused his children and [he testified] that he believed that the victim was abusing them.[2] Petitioner believed the victim was unfaithful to him during their marriage.

---

[1] The petitioner also "testified at trial that, several months prior to the murder, he spoke with [the victim's] ex-husband and became convinced that [she] had lied about the rape and feigned psychological problems in order to manipulate him." *State v. Maraschiello*, 88 S.W.3d 586, 590 n.2 (Tenn. Crim. App. 2000).

[2] To be clear, the petitioner testified that he believed "his wife was herself abusing the children, sexually and otherwise." *Maraschiello*, 88 S.W.3d at 592. Specifically, the petitioner testified that he believed his

2

These beliefs led to Petitioner's decision to murder the victim and "rescue the children."

In January 1995, Petitioner approached Timothy Winston and offered to pay him $10,000 if he would assist Petitioner in the murder of the victim. Mr. Winston agreed; Petitioner paid him $5000, and they began to formulate their plan. Petitioner purchased the 12 gauge that was used as the murder weapon. He removed the serial number and shortened the barrel length. Petitioner stole the car that he used for transportation during the commission of the murder. Petitioner prepared incendiary devices to destroy the car after the murder.

The night of February 16, 1995, Petitioner placed the shotgun, ammunition, binoculars, a police scanner, and the incendiary devices into the stolen car. Petitioner drove to the victim's place of employment, and Mr. Winston followed Petitioner in another car. Mr. Winston also had a police scanner and a change of clothes for Petitioner. Petitioner observed the victim drive out of the parking lot, and he and Mr. Winston began to follow her. Mr. Winston became separated, but Petitioner continued to follow her successfully to her home.

The victim's roommate, Linda Hubenthal, and the victim's boyfriend, Tommy Piper, were inside the home. The victim's daughters were asleep in a rear bedroom of the home. Ms. Hubenthal and Mr. Piper heard the victim arrive home and attempt to open the door but the security chain was fastened. Before Mr. Piper could unfasten the chain, he heard the victim say, "[W]hat the hell do you want." Mr. Piper said he then heard loud noises. Several pellets penetrated the front door. Mr. Piper heard the victim scream for help. In a statement to police, Petitioner recalled that upon arrival to the victim's home, he got out of the car with the shotgun, followed the victim to the porch, aimed the shotgun, and pulled the trigger. He missed on the first shot and hit the door. He then shot three or four more times from a distance of about fifteen feet. The victim died as a result of the shotgun wounds.

Medical testimony concluded that the victim was shot in the abdomen from a distance of ten or twenty feet and the victim's chest from a distance of six feet or less. The victim was also shot in the head. This wound appeared to be a "contact wound," inflicted when the muzzle of shotgun was in contact with the victim's head.

After the murder, Petitioner left the victim's home in the stolen car. He encountered Mr. Winston on the way out of the victim's neighborhood. Mr. Winston followed Petitioner to Frost Auto Alignment in Clarksville. Petitioner parked the stolen car, placed the incendiary devices around it, and ignited one of the devices. Petitioner got into Mr. Winston's car and they drove towards Nashville. Petitioner changed into clean clothes. The pair took a "circuitous" route from Clarksville to Nashville, and Petitioner threw various incriminating items out the car window along the way.

---

wife did not feed the children properly, hit them, and possibly sexually abused their oldest daughter on one occasion. (Doc. No. 16-7 at 87–89.)

On their way to Nashville, Trooper Timothy Dover conducted a traffic stop of the vehicle. Deputy Randall Anderson assisted in the stop. The Clarksville Police Department had not issued a "BOLO" for Petitioner at this point. Accordingly, after he checked Mr. Winston's driver's license and issued a traffic ticket, Trooper Dover allowed Petitioner and Mr. Winston to depart. After the stop, Petitioner and Mr. Winston drove to the Sycamore Creek Bridge on Highway 49. At the bridge, Petitioner removed the barrel from the shotgun, exited the car with the remaining shotgun components and threw them into the creek. Before Petitioner returned to the car, Deputy Anderson approached the bridge, and Mr. Winston drove away. Deputy Anderson stopped his car on the bridge and asked Petitioner what he was doing. Petitioner told Deputy Anderson that he needed to "relieve himself" and that Mr. Winston drove away as a joke. Petitioner asked Deputy Anderson to pursue Mr. Winston and ask him to return to the bridge. Deputy Anderson pursued Mr. Winston, and at the same time, Deputy Anderson radioed Trooper Dover and asked him to drive to the bridge and further question Petitioner.

Trooper Dover found Petitioner walking along the road about 300 feet from the bridge. He stopped his car and requested Petitioner's identification. Petitioner repeated the same story he told Deputy Anderson. Meanwhile, Deputy Anderson detained Mr. Winston. In contrast to Petitioner's story, Mr. Winston claimed Petitioner was a hitchhiker, and he left him at the bridge to "get rid of him." Ultimately, Mr. Winston admitted that he knew Petitioner. Deputy Anderson again radioed Trooper Dover, apprised him of Mr. Winston's location, and Trooper Dover drove Petitioner to that location. Trooper Dover and Deputy Anderson checked Mr. Winston's and Petitioner's driver's licenses with "NCIC." The officers found nothing, and Mr. Winston and Petitioner were allowed to depart. During the encounter, Deputy Anderson saw the barrel of a shotgun in the backseat of Mr. Winston's car.

After a preliminary investigation into the victim's murder, Detective Allan Charvis of the Clarksville Police Department learned that Petitioner and the victim were engaged in a "heated divorce." Detective Charvis also learned that the victim was "hiding" from Petitioner. The Clarksville Police Department issued a "BOLO" for Petitioner. Immediately after the "BOLO" issuance, Trooper Dover and Deputy Anderson notified Detective Charvis that they had encountered Petitioner en route from Clarksville to Nashville sometime after the murder. Detective Charvis relayed the information to Detectives Mason and West of the Nashville Metropolitan Police Department. Detective Charvis learned that Petitioner was previously employed by the Nashville Metropolitan Police Department. Detectives Mason and West proceeded to Petitioner's home. Detective Mason erroneously believed that a warrant was being issued for Petitioner's arrest.

Petitioner denied police access to the house. He was arrested and given *Miranda* rights. Trooper Dover eventually arrived on the scene and identified Petitioner as one of two men he encountered earlier. Petitioner admitted to police that he "killed

her." Detective Bernard observed that Petitioner exhibited no remorse during the interview. Petitioner told police where he disposed of items used during the murder, including the stolen car and the gun. Petitioner and Mr. Winston were taken to the Clarksville Police Department, and Petitioner provided a written confession. On September 28, 1995, the State notified Petitioner of its intent to seek a sentence of life imprisonment with parole.

At trial, the State relied heavily on Petitioner's statements to the police. Petitioner testified on his own behalf and admitted that he killed the victim. In his defense, however, Petitioner put forth testimony to support the theory that he did not possess the mental capacity or the requisite mental state for first degree murder. Kevin Wilkinson, a pastor, captain in the Tennessee Army National Guard, and self-described amateur in the field of psychology, testified that he visited with Petitioner on March 2, 1995. Mr. Wilkinson described Petitioner's speech as "flighty." He also said that Petitioner "frequently departed from the stream of thought." Additionally, Mr. Wilkinson believed that Petitioner possessed a "very, very tenuous, a very fragile connection with reality." Mr. Wilkinson concluded that Petitioner suffered from "residual effects of a psychotic episode." He compared Petitioner's condition to soldiers coming back from war, otherwise known as "battle fatigue."

Dr. Pamela Auble, a clinical psychologist, also testified on Petitioner's behalf. She examined Petitioner on two separate occasions and reviewed Petitioner's mental health records from various places. According to Dr. Auble, Petitioner suffered from a delusional disorder, post-traumatic stress disorder, and depression. She concluded that,

> due to [Petitioner's] delusional disorder, his intent to commit . . . [the murder of his wife] was really on a false date base. He—what he believed and what was true were two different things. So that [Petitioner] was like living in a nightmare. He thought that he could see how evil this other person was and nobody else could see it. [Petitioner] acted as if—he believes that his beliefs were true. His beliefs were that this was someone who was abusing and neglecting their children, sexually, physically, and emotionally, and that she was in essence, a prostitute. So his actions were based on his belief that all that was true.

Dr. Auble conceded that Petitioner was not insane at the time of the offense. She further concluded that Petitioner was competent to stand trial.

Dr. William Kenner, a psychiatrist, also testified on Petitioner's behalf. He interviewed Petitioner and reviewed numerous records, including Dr. Auble's. He concurred with Dr. Auble's conclusions. Dr. Kenner opined that Petitioner's delusional disorder impacted the ability of Petitioner to "form intent in that his basis for his action was defective[,] and he was operating not with a full deck."

In rebuttal, the State presented the testimony of Dr. Sam Craddock, a psychologist employed by the Middle Tennessee Mental Health Institute ("MTMHI"). Petitioner was admitted to MTMHI in July 1995 and was evaluated for approximately one month. As a result, Dr. Craddock diagnosed Petitioner with a narcissistic personality disorder. Dr. Craddock conceded that psychological testing did not support his diagnosis but noted that Petitioner's responses to testing were inconsistent with observations. Dr. Craddock opined that Petitioner was not insane at the time of the offense and that he was competent to stand trial. Dr. Craddock concluded that Petitioner was capable of forming the requisite mental state for first degree murder, at the time of the murder. Dr. Rokeya Farooque, a psychiatrist, also employed MTMHI, concurred in Dr. Craddock's opinion. Dr. Farooque also rejected Dr. Auble's and Dr. Kenner's diagnosis. She explained that interviews with Petitioner's friends and family had revealed that Petitioner's beliefs regarding his wife were based in reality.[3]

*Maraschiello v. State*, No. M2019-01287-CCA-R3-PC, 2020 WL 7090200, at *1–4 (Tenn. Crim. App. Dec. 4, 2020) (internal citations omitted).

On this proof, the jury convicted the petitioner of first-degree murder, arson, possession of a shotgun with an altered serial number, and theft. For the murder conviction, the State sought a sentence of life without the possibility of parole (Doc. No. 16-2 at 15), but the jury imposed a life sentence. (Doc. No. 16-5 at 78.) For the other convictions, the court sentenced the petitioner to an effective 5-year consecutive sentence. (*Id.* at 91–94; Doc. No. 17-28 at 69–70.) The TCCA affirmed, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. *Maraschiello*, 88 S.W.3d 586, *perm. app. denied* Dec. 4, 2000.

The petitioner filed a pro se post-conviction petition in 2001 (Doc. No. 17-1 at 37–133), and the court appointed counsel. The petitioner cycled through several attorneys (and represented himself for a time), and the judge initially assigned to the case retired, before a second judge held

---

[3] Specifically, Dr. Farooque testified that the petitioner's friends and family corroborated the petitioner's beliefs that his wife was "a liar" and a manipulator who was "unfaithful to him" and did not "tak[e] good care of his children." (Doc. No. 16-10 at 188–89, 192.) However, Dr. Farooque did not verify the petitioner's claims that his wife had obsessive compulsive disorder, sexually abused the children, and was a drug abuser. (*Id.* at 187–90, 194.)

6

evidentiary hearings on three days in 2018. (Doc. Nos. 18-4, 18-6, 18-7.) The court denied post-conviction relief (Doc. No. 17-29 at 15–86), the TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. *Maraschiello*, 2020 WL 7090200; (Doc. No. 18-21).

## II.     Claims

The petitioner initiated this case with three filings: a habeas petition divided into seventeen grounds for relief (Doc. No. 1 at 7–37); a supporting memorandum listing the "main issues" as three claims of ineffective assistance of counsel and two claims of post-conviction court error (Doc. No. 4 at 2); and a filing titled "Additional Claims" that asserts a claim of ineffective assistance of post-conviction counsel and another claim of post-conviction court error. (Doc. No. 4-1 at 1–3.) These filings are repetitive and difficult to understand in a vacuum, but because the petitioner is representing himself, the court has considered the entire available record and liberally construed his filings to the fullest extent practicable. *See MacLloyd v. United States*, 684 F. App'x 555, 558 (6th Cir. 2017) (quoting *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) ("'The allegations of a pro se habeas petition . . . are entitled to a liberal construction,' which may "require[] active interpretation in some cases to construe a pro se petition to encompass any allegation stating federal relief.'")). Giving the petitioner the benefit of this liberal construction, the court understands the petitioner to assert the following claims:

1.      Pretrial counsel, Charles Bloodworth, failed to convey the petitioner's acceptance of a plea offer in April 1995. (Doc. No. 1 at 10–11, 14–16, 19, 22, 28, 32–35, 39; Doc. No. 4 at 2.)

2.      Pretrial counsel, Edward DeWerff, failed to obtain experts in advance of the suppression hearing regarding the physical and mental state the petitioner was in when he gave an inculpatory statement to police. (Doc. No. 1 at 19, 36; Doc. No. 4 at 2.)

3.      Trial counsel, Debra Wall, provided the petitioner ineffective assistance by:

A.      Not attempting to "re-capture" the April 1995 plea for which Attorney Bloodworth failed to convey the petitioner's acceptance (Doc. No. 1 at 36–37);

B. Not obtaining experts regarding the petitioner's physical and mental state when he killed the victim to further a "diminished capacity" defense (*id.* at 7, 19, 24–25, 35–36; Doc. No. 4 at 2; Doc. No. 4-1 at 2);

C. Not rebutting the victim's "false report of spousal abuse" (Doc. No. 1 at 8);

D. Conspiring with defense experts Dr. Pamela Auble and Dr. William Kenner to make the petitioner "look 'crazy' at trial" (*id.* at 12); and

E. Not rebutting the testimony of Dr. Charles Harlan, who performed an autopsy of the victim, that the victim had a "contact wound" to the head to further a "crime of passion" defense. (*Id.* at 13, 18–19, 36–37; Doc. No. 4 at 2.)

4. The post-conviction court erred by:

A. Not allowing the petitioner to call sixty-nine witnesses for his evidentiary hearing and limiting the testimony of Orest Logusz and Debra Wall (Doc. No. 1 at 7–18, 20–24, 26–27, 29–32, 34, 36–39; Doc. No. 4 at 1–2; Doc. No. 4-1 at 2–3); and

B. Deeming the petitioner "delusional." (Doc. No. 1 at 26, 38; Doc. No. 4 at 2.)

5. Post-conviction counsel, James Simmons, provided the petitioner ineffective assistance by failing to:

A. Present evidence that he is not delusional (Doc. No. 1 at 10); and

B. Call witnesses to establish the petitioner's diminished mental capacity at the time of the offenses. (Doc. No. 4-1 at 1–2.)

## III. Legal Standard

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA sets a very high bar for granting federal relief on claims "adjudicated on the merits" in state court. *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). An "incorrect or erroneous" application is not enough; instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. §

2254(b)(1)(A). In Tennessee, a petitioner can exhaust all available state remedies for a claim by presenting it to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is an "important corollary" to the exhaustion requirement. *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citations omitted). It prevents a federal habeas court from reviewing "federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Id.* A claim also may be "technically exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). "Cause" has been described as "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 582 U.S. at 528 (citations omitted). "Prejudice" means that the errors must have resulted in "actual and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (internal citations and quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

10

**IV.    Analysis**

The respondent argues that the petitioner's claims should be denied for three reasons: they are not viable grounds for relief in a federal habeas proceeding under Section 2254; they are without merit under AEDPA's demanding standard for claims adjudicated on the merits in state court; and they are not subject to review on the merits based on the doctrine of procedural default. (*See* Doc. No. 19 at 1.) The court agrees and will address each category of claims in turn.

**A.    Non-Cognizable**

A federal court can grant a state prisoner's request for habeas relief "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). A ground for habeas relief that does not assert a violation of federal law, therefore, is "outside the scope of federal habeas corpus review." *See Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citations omitted).

**1.    Post-Conviction Court Errors**

In Claim 4.A, the petitioner asserts that the post-conviction court erred by restricting the number of witnesses allowed to testify at his evidentiary hearing and limiting the testimony of two witnesses who did testify. And in Claim 4.B, the petitioner asserts that the post-conviction court erred by deeming him "delusional."

As a matter of law, however, a federal habeas petition "cannot be used to mount challenges to a state's scheme of post-conviction relief." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854–55 (6th Cir. 2017) (quoting *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001)). Although "'the ultimate goal in' a case alleging post-conviction error 'is release from confinement,'" *Cress*, 484 F.3d at 853 (quoting *Kirby v. Dutton*, 794 F.2d 245, 248 (6th Cir. 1986)), the Sixth Circuit has held that a state prisoner's "attacks on post-conviction proceedings

11

'address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.'" *Leonard*, 846 F.3d at 855 (quoting *Kirby*, 794 F.2d at 247). Accordingly, Claims 4.A and 4.B are not viable grounds for federal habeas relief.

### 2. Ineffective Assistance of Post-Conviction Counsel

In Claim 5.A, the petitioner asserts that post-conviction counsel was ineffective for failing to present evidence establishing that he is not delusional. And in Claim 5.B, the petitioner asserts that post-conviction counsel was ineffective for failing to call witnesses establishing that the petitioner had a diminished mental capacity at the time of the offenses.

These claims also fail as a matter of law, as the statute governing federal habeas relief for state prisoners specifically precludes an attorney's alleged ineffective assistance during post-conviction proceedings from serving as "a ground for relief." 28 U.S.C. § 2254(i); *see also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." (citations omitted)). As independent grounds for federal habeas relief, therefore, Claims 5.A and 5.B will be denied.

As an allegation of "cause" to excuse the procedural default of another claim, however, the ineffective assistance of post-conviction counsel may be considered in this case. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012). The court will consider this assertion accordingly below.

### B. Adjudicated on the Merits

The petitioner presented two claims of ineffective assistance of counsel to the TCCA on post-conviction appeal: Claim 1, challenging Attorney Bloodworth's assistance with regard to an alleged plea offer; and Claim 3.E, challenging Attorney Wall's assistance with regard to furthering a "crime of passion" defense at trial. *See Maraschiello*, 2020 WL 7090200, at *14–17. This court

reviews the TCCA's rulings on these claims with "AEDPA deference"—a standard of review that considers whether the "state court [] applied clearly established federal law to reasonably determined facts," and if so, prevents a federal habeas court from "disturb[ing] the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 141 S. Ct. 517, 520 (2020) (quoting *Harrington*, 562 U.S. at 103).

The TCCA applied clearly established federal law to reject both of these claims. The test for judging constitutionally ineffective assistance is set out in *Strickland v. Washington,* 466 U.S. 668 (1984). And for a claim like Claim 1—asserting that an attorney's "deficient performance or erroneous advice" led a defendant to "miss[] out on a formal plea offer"—application of the *Strickland* standard is guided by *Lafler v. Cooper*, 566 U.S. 156 (2012). *Johnson v. Genovese*, 924 F.3d 929, 934–35 (6th Cir. 2019) (citing *Lafler*, 566 U.S. at 172–74). The TCCA appropriately cited and applied both *Strickland* and *Lafler*. *See Maraschiello*, 2020 WL 7090200, at *14–15 (citing *Nesbit v. State*, 452 S.W.3d 779, 800 (Tenn. 2014) (noting, through citation, that the framework for applying *Strickland* in this context set out by the Tennessee Supreme Court in *Nesbit* is drawn from *Lafler*)).

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Where "[h]aving to stand trial, not choosing to waive it, is the prejudice alleged," the petitioner

must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 163–64. And where a federal habeas court is reviewing an ineffective-assistance claim with AEDPA deference, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

### 1.    Bloodworth's Pretrial Plea Assistance

On April 3, 1995, a Montgomery County grand jury indicted the petitioner for first-degree murder, arson, possession of an explosive, possession of a shotgun with an altered serial number, and theft. (Doc. No. 16-1 at 4–6.) The petitioner alleges that, within a month of the indictment, the State made a formal plea offer for Attorney Bloodworth to convey to the petitioner. (*See* Doc. No. 1 at 1, 10.) According to the petitioner, this offer would have allowed him to plead guilty to second-degree murder and serve a 25-year sentence with 30% release eligibility, with all other charges being dropped. (*See id.*) The petitioner alleges that he accepted this offer, and in Claim 1, he asserts that Bloodworth was ineffective for failing to communicate his acceptance to the State. (*See id.* at 10–11, 19, 22.)

The TCCA rejected this claim for at least two reasons. First and foremost, the petitioner failed to establish the existence of the alleged 25-year plea offer from the State. And second, even

if this alleged offer did exist and the petitioner accepted it, he failed to show that the trial court would have accepted it. *See Maraschiello*, 2020 WL 7090200, at \*15–16. The petitioner strongly contests the factual determination underlying the first rationale, but he altogether fails to address the second. The court will address the second rationale before turning to the first.

To restate, a petitioner claiming prejudice from missing out on a plea agreement must show, among other things, that the trial court would have accepted the terms of the agreement. *Lafler*, 566 U.S. at 164. This requirement is "especially important when state law gives . . . courts the discretion to reject a plea agreement." *Johnson v. Genovese*, No. 3:14-CV-02305, 2018 WL 1566826, at \*18 (M.D. Tenn. Mar. 30, 2018), *aff'd*, 924 F.3d 929 (6th Cir. 2019) (citing *Missouri v. Frye*, 566 U.S. 134, 147 (2012)). "In Tennessee, the decision to accept or reject a plea agreement rests within the sound discretion of the trial court." *Pye v. State*, No. M2011-01633-CCA-R3-PC, 2012 WL 6738392, at \*7 (Tenn. Crim. App. Dec. 28, 2012) (collecting cases).

The petitioner did not put forth any evidence on this issue in state court, and any inferences that can be drawn from the record as to how the trial court might have exercised its discretion if presented with the alleged 25-year offer do not favor the petitioner. The petitioner maintains that this offer was conveyed in late April 1995, but on May 8, 1995, the court ordered the petitioner to be evaluated for his competency to stand trial. (Doc. No. 16-1 at 10–11.) The competency standard for standing trial is the same as the competency standard for pleading guilty. *Godinez v. Moran*, 509 U.S. 389, 391 (1993). It is unlikely that the trial court would have accepted any guilty plea from the petitioner prior to settling this competency question. And as for the specific agreement to serve 25 years at 30% release eligibility, the trial court made some statements suggesting that it may not have accepted such a sentence. When the court ruled for the petitioner's sentences to run consecutively, for example, it remarked that the petitioner had committed "a premeditated,

15

planned-out, cold-blooded murder of an innocent person regardless of what Mr. Maraschiello may think his provocation was." (Doc. No. 16-16 at 41.) The court further stated that it considered the total sentence ultimately imposed in this case—life plus 5—to be "not only appropriate, but . . . woefully inadequate." (*Id.* at 42.) Accordingly, it was not unreasonable for the TCCA to conclude that the petitioner failed to show that the trial court would have accepted the alleged 25-year offer if presented with it. This ruling provides an independent basis to deny Claim 1.

Even more fundamentally, moreover, the petitioner also fails to demonstrate that the TCCA made an unreasonable determination of the facts when it found that he failed to prove the existence of a 25-year offer from the State. On this point, the TCCA ruled as follows:

> [T]he post-conviction court repeatedly determined that Petitioner was not a credible witness. With regard to the plea agreement, the post-conviction court determined that there is "little credible evidence that the State actually made an offer for [Mr. Bloodworth] to communicate." The record includes a pro se motion to "effectuate the offer [Petitioner] insists the State made, but the only person who has presented proof supporting [Petitioner's] contention is [Petitioner]." The post-conviction court continued:
>
>> No additional pleadings, order, or hearings regarding the supposed offer appear in the trial court record, and during the post-conviction hearing [Petitioner] was the only person who testified regarding the existence of the 25-year plea deal. This Court does not find Petitioner's testimony credible.
>>
>> Mr. Bloodworth testified he did not remember if any specific plea offers were made in this case, but at the time counsel represented [Petitioner]—which occurred very early in Petitioner's Circuit Court case—the State was likely still determining whether the State would seek the death penalty. The Court finds Mr. Bloodworth's testimony credible, and based on the tenor of Mr. Bloodworth's testimony, the Court finds it likely that if Mr. Bloodworth had been presented the offer Petitioner insists the State made, counsel would have discussed the deal with Petitioner.
>>
>> The Court has no reason to doubt Mr. Logusz discussed the possibility of Petitioner's pleading guilty with the Petitioner and Mr. Bloodworth, but no evidence was presented regarding the exact nature of the plea offer Mr. Logusz claimed he discussed with

16

Petitioner and his then-attorney. Mr. Logusz did not state the exact terms of the plea, and neither Mr. Bloodworth nor [Petitioner] was asked about their discussions with Mr. Logusz. Thus, his testimony is unavailing to Petitioner.

The only proof of a plea offer, apart from Petitioner's testimony, was presented by Mr. DeWerff, who memorialized a 55-year plea deal offered by the State around the time of the suppression hearing. Both Mr. DeWerff and [Petitioner] testified that counsel presented this offer to Petitioner, who rejected the proposed deal.

In sum, Petitioner has failed to present credible evidence that the State actually made an offer for the Petitioner to plead guilty to second degree murder and receive a 25-year sentence.

Clearly the post-conviction court determined that Petitioner failed to prove that trial counsel's performance was deficient because Petitioner failed to prove the existence of the 25-year plea offer. An attorney's performance cannot be deficient for failing to convey an offer that never existed.

The post-conviction court found Petitioner failed to prove by clear and convincing evidence the existence of a 25-year plea offer from the State. The evidence in the record does not preponderate against this finding. *See Vaughn [v. State,]* 202 S.W.3d [106,] 115 [Tenn. 2006]. The post-conviction court did not accredit Petitioner's testimony regarding this offer, and we will not second-guess such credibility determinations on appeal. *See [State v.] Honeycutt*, 54 S.W.3d [762,] 766–67 [Tenn. 2001]. The record does not support a finding that this offer was ever made. Apart from Petitioner's testimony, there was a copy of a letter from Petitioner to counsel outlining the plea deal and indicating his acceptance of the deal and an un-notarized affidavit from Petitioner in the record. There was no proof given as to when this letter was sent or whether Mr. Bloodworth received it.

*Maraschiello*, 2020 WL 7090200, at *16.

This factual determination was not objectively unreasonable. At the evidentiary hearing, both Attorney Bloodworth and Art Beiber—the prosecutor for the petitioner's criminal case— testified that they did not recall discussing any specific plea agreements with one another. (Doc. No. 18-4 at 18, 26.) The petitioner, however, testified that Bloodworth conveyed the alleged 25-year plea offer from the State on April 27, 1995, and that the petitioner accepted it in a letter to Bloodworth the following day. *Maraschiello*, 2020 WL 7090200, at *5. The TCCA found this

17

testimony to be incredible—a finding that is "entitled to great deference" and must not be disturbed "unless [it is] clearly erroneous, particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (internal citations and quotation marks omitted). Indeed, when reviewing a state-court factual determination with AEDPA deference, reversal is required "only where '[n]o fair and reasonable reading of the record could permit' the factual determination." *Hill*, 792 F.3d at 681 (quoting *Rice*, 660 F.3d at 257).

Reading the record as a whole, there are some contemporaneous references to a possible plea deal in April and May 1995, but those references are attributable solely to the petitioner—not the State. To start, there is a copy of the letter in which the petitioner supposedly accepted the State's alleged 25-year offer on April 28, 1995. But this letter does not actually reference a firm offer from the State. Instead, it says, "I do wish if you speak with the DA to enter a plea of guilty to 'TOP END' 2nd Degree Murder" (Doc. No. 17-12 at 45)—a statement that can be reasonably read as proposing an offer rather than accepting one.

Next is a copy of a letter dated May 1, 1995, asking Bloodworth to "see if they will take the 'Top end Plea' of 2nd degree" (*id.* at 46)—a request that would have been unnecessary if the petitioner was simply responding "yes" to a firm offer already made by the State.

Even more damaging to the petitioner's position is a letter to Bloodworth dated May 18, 1995. There are at least four different handwritten copies of this letter, each with some variation in wording, but all reasonably read as containing instructions for *Bloodworth* to propose something like the alleged 25-year offer. (Doc. 16-1 at 14 ("Copy 1"); Doc. No. 16-1 at 33 ("Copy 2"); Doc. No. 17-12 at 49 ("Copy 3"); Doc. No. 17-15 at 27 ("Copy 4").) That is, all four copies of this letter state the petitioner's concern about whether "the 'Plea' of Top End '2nd[4] Degree'" will be

---

[4] Copy 2 spells out "Second" (Doc. No. 16-1 at 33), and Copies 3 and 4 phrase it "Top end Second Degree." (Doc. No. 17-12 at 49; Doc. No. 17-15 at 27.)

18

accepted, with the "other charges" running "concurrent," given his view that "[t]he 25 years with eligibility for parole in 7 years (+/- 1) will be enough punishment." They all ask Bloodworth to "reply" if that "deal" satisfies "all parties (myself, the DA and your office)."[5] (Doc. No. 16-1 at 14, 33; Doc. No. 17-12 at 49; Doc. No. 17-15 at 27.) Again, it would have been unnecessary for Bloodworth to inform the petitioner whether the State was satisfied with a 25-year offer if the State had already made that offer to the petitioner.

Then came the petitioner's pro se "Motion to Formalize Preliminary Plea," dated May 29, 1995. (Doc. No. 16-1 at 12.) This filing was accompanied by an "affidavit" that laid out the terms of the alleged 25-year offer and stated that the petitioner "was presented with a tentative preliminary plea on April 27, 1995 from the prosecution which [he] was willing to accept." (*Id.* at 13.) This is the only contemporaneous reference in the state court record that cannot be reasonably read to support the TCCA's factual determination.

Two months later, however, there is more evidence in the record to support the TCCA's determination. The petitioner was admitted to MTMHI for the month of July 1995, *see Maraschiello*, 2020 WL 7090200, at *4, and MTMHI staff prepared a report regarding this admission. (Doc. No. 17-18 at 36–39.) According to this report, the petitioner told MTMHI staff that "he has been offered a plea, however, he said he was not pleased with what has been offered, and he proposed a charge of second degree murder." (*Id.* at 39.) This documentation is consistent with the notion that the petitioner, not the State, was the party making early efforts towards a plea agreement resembling the alleged 25-year offer.

---

[5] Copy 3 uses a few minor variations on some of these quoted phrases, namely "other allegations" (rather than "other charges"), "20-25 years" (rather than "25 years"), and "DA, you & myself" (rather than "myself, the DA and your office"). (Doc. No. 17-12 at 49.)

19

In sum, the post-conviction court thoroughly considered the evidence in the record, observed the petitioner's demeanor when he testified at the evidentiary hearing, and found him to be incredible on the subject of the alleged 25-year plea offer from the State. *See Wooten v. Warren*, 814 F. App'x 50, 59 (6th Cir. 2020) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984) ("[S]pecial deference is given to the trial court's credibility determinations, particularly when made on the basis of oral (as opposed to documentary) evidence.")). The TCCA deferred to that credibility finding when it determined that the petitioner failed to prove the existence of the alleged 25-year offer. A reasonable reading of the record supports that determination, so AEDPA prevents this court from disturbing it. And Attorney Bloodworth, as explained by the TCCA, could not have been ineffective for "failing to convey an offer that never existed." *Maraschiello*, 2020 WL 7090200, at *16. For all of these reasons, Claim 1 will be denied.

### 2. Wall's Pursuit of a "Crime of Passion" Defense at Trial

Dr. Charles Harlan, who performed an autopsy of the victim, testified at trial that the victim died after being struck with three discharges from a shotgun resulting in wounds to her "head, chest and abdomen." (Doc. No. 16-9 at 134–35.) As to the head wound, Dr. Harlan stated that he could not "definitively" say the distance between the shotgun muzzle and point of entry. (*Id.* at 137.) When asked if he could "get close," he responded, "No sir, not really except it is not a distant shotgun wound because there is no satellite grouping of pellets so it is either near or contact shotgun wound." (*Id.*) Dr. Harlan clarified that "[n]ear means less than six feet" and "[c]ontact means that the muzzle is in contact with the skin. This is most consistent with a contact shotgun wound, but I can't rule out a near shotgun wound." (*Id.* at 137–38.) In Claim 3.E, the petitioner asserts that Attorney Wall was ineffective for failing to rebut this testimony, as it cut against the presentation of a "crime of passion" defense. (*See* Doc. No. 1 at 19 (alleging that Dr. Harlan's

"contact wound" testimony was false and improperly presented the petitioner as more of a "dangerous offender" than someone who was "trying to rescue his two children from further child abuse in a 'heat of passion' episode").)

The TCCA rejected this claim, finding that a "crime of passion" defense would have been "antipodean to the diminished capacity defense advanced by trial counsel at trial. Trial counsel is never required to 'pursue inconsistent defense theories [in order] to provide constitutionally effective representation.'" *Maraschiello*, 2020 WL 7090200, at *14 (Tenn. Crim. App. Dec. 4, 2020) (quoting *Felts v. State*, 354 S.W.3d 266, 280 (Tenn. 2011)). "Moreover," the TCCA explained, "the proof at trial overwhelmingly established premeditation, so it would have been both irrational and unreasonable for trial counsel to pursue a theory that the murder was voluntary manslaughter." *Id.* (citing *Maraschiello*, 88 S.W.3d at 592).

This ruling was not unreasonable. In practical terms, pursuing a "crime of passion" defense would have meant attempting to secure a voluntary-manslaughter conviction on the murder charge. *See State v. Moore*, No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *10 (Tenn. Crim. App. May 12, 2016) ("[V]oluntary manslaughter is a separate criminal offense rather than a defense to second degree murder."). "[V]oluntary manslaughter is defined as 'the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Id.* (quoting Tenn. Code Ann. § 39-13-211(a)). Pursuing a "diminished capacity" defense, on the other hand, meant introducing evidence to "demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." *State v. Hall*, 958 S.W.2d 679, 690 (Tenn. 1997). Attorney Wall put on proof that the petitioner had a mental disease or defect, and this court agrees with the TCCA that it was not objectively

21

unreasonable for her to focus on this single strategy to the exclusion of a strategy that would have required her to argue that the petitioner was in an adequately provoked state of passion when he killed his estranged wife—particularly as there was overwhelming evidence that the killing was the product of prolonged, considered planning rather than an unexpected confrontation. *See State v. Wren*, No. W2018-02087-CCA-R3-CD, 2019 WL 4464267, at *7 (Tenn. Crim. App. Sept. 13, 2019) (quoting *State v. Thornton*, 730 S.W.2d 309 (Tenn. 1987) (explaining that the Tennessee Supreme Court has "relied upon the brevity of the time between the alleged inciting incident and the commission of the offense after considering whether 'there had been sufficient time for the passion or emotion . . . to cool before the shooting'")).

Additionally, as for Dr. Harlan's specific "contact wound" testimony, the court notes that it was more equivocal than the petitioner suggests in his habeas petition. The petitioner alleges that Dr. Harlan "deliberately lied . . . about [a] 'contact wound' to the head of the victim." (*See* Doc. No. 1 at 13.) But as noted above, Dr. Harlan's actual testimony was that the victim's head wound was "most consistent with a contact shotgun wound, but I can't rule out a near shotgun wound." (Doc. No. 16-9 at 138.) A "near" wound, according to Dr. Harlan, was a wound inflicted from "less than six feet." (*Id.* at 137.) And the petitioner's own trial testimony was that, while he "did not aim at her head" (Doc. No. 16-7 at 127), he got as close to the victim as "maybe five feet, something like that." (*Id.* at 125.) Because Dr. Harlan's testimony regarding the victim's head wound was not necessarily inconsistent with the petitioner's own testimony on this point, trial counsel was not ineffective for failing to rebut it. For all of these reasons, Claim 3.E will be denied.

## C.     Procedurally Defaulted

There are five claims remaining, all asserting ineffective assistance of counsel: Claim 2, challenging Attorney DeWerff's failure to obtain experts for the suppression hearing; Claim 3.A,

22

challenging Attorney Wall's failure to re-capture the alleged 25-year plea offer discussed above; Claim 3.B, challenging Wall's failure to obtain additional experts to further a "diminished capacity" defense at trial; Claim 3.C, alleging that Wall failed to rebut the victim's "false report of spousal abuse"; and Claim 3.D, alleging that Wall conspired with defense experts to make the petitioner "look 'crazy.'"

The petitioner did not present these claims to the TCCA, and there are no remaining state court remedies to do so. *See* Tenn. Code Ann. § 40-30-102(c) (establishing Tennessee's "one-petition" limitation on post-conviction relief); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997) (explaining the three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, none of which applies to these claims)). Accordingly, these claims are procedurally defaulted. *See Bagley*, 696 F.3d at 483 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted.")).

Procedurally defaulted claims are not subject to review unless the petitioner can establish either (1) "cause" for failing "to present the claims" and "actual prejudice," or (2) the existence of "new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges*, 727 F.3d at 530 (citations omitted). The petitioner asserts that post-conviction counsel was ineffective, which can sometimes establish "cause" for the failure to present defaulted claims under *Martinez v. Ryan*. 566 U.S. at 17. And liberally construing the petitioner's filings, he alleges the existence of new evidence establishing his innocence of first-degree murder. (*See* Doc. No. 4-1 at 2; Doc. No. 21 at 31 (referencing a "medical and comprehensive psychiatric examination" by VA Dr. Jackson in 2010).)

### 1. Post-Conviction Counsel's Asserted Ineffectiveness

For three of the five remaining claims, the petitioner cannot rely on *Martinez* to obtain review because they were defaulted on post-conviction appeal. *Martinez* "does not concern attorney errors in . . . appeals from initial-review collateral proceedings," *Martinez*, 566 U.S. at 16, as its "chief concern" is to "ensure that meritorious claims of [ineffective assistance of trial counsel] receive review by at least one state or federal court." *Davila*, 582 U.S. at 532 (citing *Martinez*, 566 U.S. at 10, 12). Here, at the trial court level of his post-conviction proceedings, the petitioner raised Claim 2 (regarding Attorney DeWerff's assistance at the suppression hearing), Claim 3.B (regarding Attorney Wall's failure to obtain additional experts to further a "diminished capacity" defense at trial), and Claim 3.C (regarding Wall's alleged failure to rebut the victim's "false report of spousal abuse"). The post-conviction court rejected these claims in its written order. (Doc. No. 17-29 at 70–71 (Claim 2); *id.* at 71–72 (Claim 3.B); *id.* at 72–73 (Claim 3.C).) And the petitioner did not appeal the denial of these claims to the TCCA. (*See* Doc. No. 18-14 (post-conviction appeal brief).) As a matter of law, therefore, *Martinez* cannot excuse the default of Claims 2, 3.B, and 3.C.

For the two remaining claims, *Martinez* is unhelpful because the petitioner has not shown them to be "substantial." *Martinez* requires, among other things, that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 566 U.S. at 14. "A substantial claim is one that has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16).

In Claim 3.A, the petitioner asserts that Attorney Wall was ineffective for failing to re-capture the alleged 25-year plea offer that is the subject of Claim 1. But as discussed above, a reasonable reading of the record supports the TCCA's conclusion that the State did not make this alleged offer. And even if this alleged offer existed in April 1995, the record reflects that it no longer existed by the time Wall was appointed to represent the petitioner in May 1996 (*see* Doc. No. 16-4 at 46), as the intervening period saw the State make a much more severe 55-year offer to the petitioner through Attorney DeWerff. (*See* Doc. No. 18-8 at 2.) Claim 3.A, accordingly, is insubstantial.

In Claim 3.D, the petitioner asserts that Attorney Wall conspired with defense experts Dr. Auble and Dr. Kenner to make the petitioner "look 'crazy' at trial." At the evidentiary hearing, Wall testified that she made a strategic decision to pursue a defense of diminished capacity, given the petitioner's documented confession and his clear intention to invoke his right to testify at trial. (*See* Doc. No. 18-7 at 15–16.) This defense required Wall to introduce evidence that "a mental disease or defect" prevented the petitioner from forming "the requisite culpable mental state." *See Hall*, 958 S.W.2d at 690. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689. Although the diminished capacity defense was ultimately unsuccessful in avoiding a first-degree murder conviction, the claim that Wall conspired to work against the petitioner's interest by pursuing it is entirely unsupported. Claim 3.D is insubstantial.

## 2. Actual Innocence

Finally, the petitioner's reference to new evidence from VA Dr. Jackson cannot support a claim of actual innocence. The petitioner argues that Dr. Jackson's 2010 medical report is "conclusive exculpatory evidence to reduce [the petitioner's] conviction . . . from first degree to

second degree [murder] due to his mitigating disability at the time of the crime." (Doc. No. 1 at 7; Doc. No. 4-1 at 2.). But "actual innocence means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). A petitioner convicted of murder, therefore, cannot show actual innocence based on evidence that he should have been convicted of a lesser-degree offense. *See Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006) (explaining that "new evidence" supporting self-defense theory did not show petitioner was "factually innocent of killing [the victim]"); *Taylor v. Winn*, No. 20-1359, 2020 WL 4334125, at *1, 3 (6th Cir. July 13, 2020) (holding that "reasonable jurists would not debate" that petitioner convicted of first-degree felony murder made no "showing of actual innocence" where "he admitted that he was guilty of at least voluntary manslaughter") (citations omitted); *Brickey v. Smith*, No. 12-14028, 2013 WL 4029050, at *6 (E.D. Mich. Aug. 7, 2013) ("[N]ewly discovered evidence that would merely lower the degree of offense does not establish an actual innocence claim.") (collecting cases). And with no other arguments for excusing the default of Claims 2, 3.A, 3.B, 3.C, and 3.D, these claims are not subject to further review.

## V.    Request for Evidentiary Hearing and Appointment of Counsel

As a result of the analysis above, the petitioner's requests for an evidentiary hearing and the appointment of counsel will be denied. State habeas petitioners "may occasionally submit new evidence in federal court," but "'AEDPA's statutory scheme is designed to strongly discourage them from doing so.'" *Shoop v. Twyford*, 142 S. Ct. 2037, 2044 (2022) (quoting *Pinholster*, 563 U.S. at 186). When a petitioner requests an evidentiary hearing, the court "must determine at the outset whether the new evidence sought could be lawfully considered." *Id.*

The petitioner asks for a hearing to present evidence in support of his claims of post-conviction court error (Doc. No. 1 at 10, 12, 38; Doc. No. 21 at 8, 16, 47–48) and his claims that

Attorneys Bloodworth and Wall provided ineffective assistance regarding the alleged 25-year plea offer from the State. (Doc. No. 1 at 38–39; Doc. No. 21 at 10.) But claims of post-conviction court error are not cognizable grounds for federal habeas relief, regardless of what evidence the petitioner might present. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . precludes habeas relief, a district court is not required to hold an evidentiary hearing."). And as for the alleged 25-year offer, the claim challenging Bloodworth's effectiveness was adjudicated on the merits in state court, so this court's review of that claim is limited to "the record before the state court." *Pinholster*, 563 U.S. at 182. The claim challenging Wall's effectiveness, meanwhile, is procedurally defaulted without cause, so an evidentiary hearing on it would be futile. *See Cammuse v. Morgan*, 105 F. App'x 667, 670 n.4 (6th Cir. 2004) (declining to consider whether evidentiary hearing was required for habeas claim that was procedurally defaulted where petitioner had "not made a showing sufficient to excuse that default"). The petitioner, accordingly, is not entitled to an evidentiary hearing.

The court is also not required to appoint counsel for a habeas petitioner "unless counsel is 'necessary for effective discovery' or an evidentiary hearing is needed." *Scott v. Winn*, No. 18-1845, 2018 WL 5309805, at *1 (6th Cir. Oct. 22, 2018) (citing Habeas Rules 6(a) and 8(c)). No discovery or hearing is warranted here. *See Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) ("[A] court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'")); *Vizcaino-Ramos v. Lindamood*, No. 1:14-cv-1230-STA-egb, 2017 WL 5163588, at *4 (W.D. Tenn. Nov. 7, 2017) ("[I]f the claim is procedurally defaulted and the default is unexcused,

discovery on the claim would be futile[.]"). Accordingly, the petitioner is not entitled to the appointment of counsel.

## VI. Conclusion

For these reasons, the petitioner is not entitled to relief under Section 2254 and this case will be dismissed.

The petitioner cannot appeal this adverse ruling without a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the court's analysis, the petitioner has not satisfied this standard and the court will deny a COA.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

28